IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT JACKSON

Assigned on Briefs July 9, 2019

### STATE OF TENNESSEE V. ERIK STANDBACK

**Appeal from the Criminal Court for Shelby County**
No. 17-02161      James M. Lammey, Judge

_____

### No. W2018-01804-CCA-R3-CD
_____

A Shelby County jury convicted the Defendant, Erik Standback, of attempted second degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment. The trial court imposed an effective sentence of eighteen years in the Tennessee Department of Correction. On appeal, the Defendant asserts that the evidence is insufficient to support his convictions. After review, we affirm the trial court's judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**

ROBERT W. WEDEMEYER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and J. ROSS DYER, JJ., joined.

Phyllis Aluko, Shelby County Public Defender, and Tony N. Brayton, Assistant Shelby County Public Defender, Nashville, Tennessee, for the appellant, Erik Standback.

Herbert H. Slatery III, Attorney General and Reporter; Sophia S. Lee, Senior Assistant Attorney General; Amy P. Weirich, District Attorney General; and Jamie B. Kidd, Assistant District Attorney General, for the appellee, State of Tennessee.

### OPINION
### I. Facts

This case arises from a physical fight in the Defendant's yard that quickly escalated into a shooting. A Shelby County grand jury indicted the Defendant for attempted second degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment. At trial, the parties presented the following proof: Jasmine Flagg testified that, on January 21, 2017, she went to the Defendant's residence with Chevy Smith, Michael Tellis, Solomon Campbell, David Dancy, Kalon Mull, and Darius Brown. According to Ms. Flagg, the Defendant

wanted to fight with Chevy Smith. When they arrived, the Defendant exited his residence through the garage. Initially, Mr. Smith did not want to fight the Defendant but ultimately agreed.

Ms. Flagg testified that the Defendant ushered the group to the backyard to avoid a disturbance in front of the house. Ms. Flagg video-recorded the fight on her phone and posted the fight "live" on Facebook. At some point, Mr. Smith dislocated the Defendant's shoulder, and the fight stopped. Mr. Smith and the group began walking back to the car while someone helped the Defendant put his shoulder back in place, and then the Defendant ran toward the front of the house and began firing a gun at Mr. Smith. Mr. Smith ran, as did the others, but one of the bullets hit Mr. Smith in the back. Mr. Smith hit the ground, and the Defendant told Ms. Flagg to, "Get your nigga up off my street" before walking back into his house.

Michael Tellis, the driver of the car, testified that he did not know he was driving to the Defendant's residence that day. He explained that he was driving people to various addresses. The addresses were put into his phone for navigation purposes, and he merely followed the directions without knowing to whose residence he was driving. When he spoke with the police on the day of the incident, however, he acknowledged knowing that he was going to the Defendant's residence although he did not know the Defendant. When they arrived, the Defendant approached the vehicle aggressively, and the group moved to the backyard for a fight. Mr. Tellis did not observe anyone with a gun at this point.

Mr. Tellis testified that the fight ended quickly, and he began walking back to his car. As he walked through a gate, he saw the Defendant run to the garage and then fire his gun three times. He recalled the Defendant's running past him and said that he felt surprised and fearful. Mr. Tellis stated that everyone who had been in his car on the drive over was in the Defendant's front yard and began running from the gunfire. One of the bullets hit Mr. Smith in the back as he ran from the gunfire. After shooting Mr. Smith, the Defendant said, "I could have killed you but I didn't." Mr. Tellis acknowledged that he had not reported that statement to the police at the time of the incident and that this was his first mention of the Defendant's post-shooting statement.

Solomon Campbell testified that he had no idea why the group went to the Defendant's house on the day of the shooting. When he asked the others in the car why they were at the Defendant's residence, he was told there was going to be a fight. Mr. Campbell listed the names of the people in the car consistently with Ms. Flagg. At the Defendant's house, Mr. Campbell said that he attempted to dissuade the others from engaging in a fight, but "everybody" began walking to the back of the house. Mr. Campbell recounted the events surrounding the fight consistently with the other witnesses

at trial. About the actual shooting, Mr. Campbell stated that the group was walking from the backyard toward the car parked in front of the house to leave when he heard a gunshot and began running. Up until this time, Mr. Campbell had not seen anyone with a gun. In his statement to the police, Mr. Campbell reported that, as they were leaving, the Defendant ran to his garage and retrieved a gun. When Mr. Campbell saw Mr. Smith on the ground, he went to Mr. Smith to provide assistance.

On cross-examination, Mr. Campbell testified that after Mr. Smith dislocated the Defendant's shoulder, Mr. Campbell held Mr. Smith back from "going at" the Defendant. Mr. Campbell agreed that Mr. Smith did not want to stop fighting and that the Defendant was "extremely emotional." On redirect examination, Mr. Campbell agreed that in his statement to the police he said that, as everyone was leaving, the Defendant went inside his car, retrieved the gun, and began shooting. Mr. Campbell denied that he ran away out of fear. He stated, "The only reason why I was running away because I heard the shot." He explained that he was not fearful because the shooter "really wasn't pointing my way." Mr. Campbell agreed that the group was "close" in proximity to one another when the shooting began.

Mr. Smith testified that the Defendant shot him on January 21, 2017. He recalled arriving at the Defendant's house where the Defendant was waiting in the front yard. The Defendant ordered him to "[g]et out the car," and Mr. Smith complied. Mr. Smith stated that he did not want to fight, but he believed that he had to fight the Defendant "cause [he] was there." Mr. Smith stated that he did not have a gun and, initially, did not see the Defendant with a gun. The group moved to the backyard where the Defendant and Mr. Smith began to fight. After a few minutes, the others present tried to "break it up."

Mr. Smith testified that, while the others gathered to help the Defendant put his shoulder back in place, he began walking to the car to leave. As he walked toward the car, he heard "everybody saying . . . don't shoot him." The others began running to the right, leaving Mr. Smith alone standing near the car. Mr. Smith began running to the left and heard a bullet whizz past his right ear. In a panic, Mr. Smith thought of falling to the ground so that the Defendant might believe he had been shot. A second bullet went past him and then the third bullet hit him in the back, and he fell to the ground. Mr. Smith tried to push himself up off the ground but was unable to do so because the bullet had hit his spine leaving him paralyzed.

Mr. Smith looked over to see if the Defendant was approaching to shoot him again, but the Defendant did not fire his gun again. Instead, the Defendant went back inside the garage. Ms. Flagg ran over to Mr. Smith to offer assistance and called Mr. Smith's mother at his request. Mr. Smith described learning that he was permanently paralyzed at the hospital and the ensuing depression. He explained that he was an active

twenty-year-old at the time of the shooting and now has had to learn to adapt his life around his inability to walk. Mr. Smith said that he attended therapy three times a week and had a monthly appointment with his physician. He explained his "bowel training" to the jury and said that he was more susceptible to "UTIs" since the injury. He testified that his life had changed significantly due to his injuries but that he was "learn[ing] how to deal with it better."

On cross-examination, Mr. Smith agreed that he had three convictions for theft. He denied being under the influence of an intoxicant at the time of the fight although he agreed that he had been "partying" the night before the shooting.

Samuel Crews, a Shelby County Sheriff's Office detective, testified that he spoke with the Defendant at the scene. The Defendant indicated where inside the house the gun, a .380 caliber handgun, was located, and officers found the gun underneath some insulation in an unfinished closet in the Defendant's bedroom. A shell casing was also collected from the western side of the driveway approximately ten-feet behind a vehicle parked in front of the Defendant's residence.

Erika Watson, the Defendant's mother, testified for the defense. She recalled that, at around noon on the day of the shooting, she was leaving the house when the Defendant told her he did not feel well. He asked her to take him to the emergency room. Ms. Watson told her son to rest and if he did not feel better when she returned, she would take him to the emergency room. The Defendant's sister, Ambria Standback, testified that she was home with the Defendant on the day of the shooting. She was in the kitchen when she saw a car outside and five people walking up to their front yard. Ms. Standback went upstairs and asked the Defendant if he knew the people outside in the front yard, and the Defendant went outside. Later, Ms. Standback observed the Defendant and Mr. Smith fighting in the backyard. When they finished, she went to her room. Shortly thereafter, she heard gunfire, looked out the Defendant's bedroom window, and saw "the boy laying on the ground." She called her mother.

After hearing the evidence, the jury convicted the Defendant of attempted second degree murder, aggravated assault, employing a firearm during the commission of a dangerous felony, and reckless endangerment. At a subsequent sentencing hearing, the trial court merged the Defendant's convictions for attempted second degree murder and aggravated assault and imposed an effective sentence of eighteen years in the Tennessee Department of Correction. It is from these judgments that the Defendant appeals.

## II. Analysis

On appeal, the Defendant contends that the evidence is insufficient to sustain his convictions. When an accused challenges the sufficiency of the evidence, this Court's standard of review is whether, after considering the evidence in the light most favorable to the State, "*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see* Tenn. R. App. P. 13(e); *State v. Goodwin*, 143 S.W.3d 771, 775 (Tenn. 2004) (citing *State v. Reid*, 91 S.W.3d 247, 276 (Tenn. 2002)). This standard applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of both direct and circumstantial evidence. *State v. Pendergrass*, 13 S.W.3d 389, 392-93 (Tenn. Crim. App. 1999) (citing *State v. Dykes*, 803 S.W.2d 250, 253 (Tenn. Crim. App. 1990)). In the absence of direct evidence, a criminal offense may be established exclusively by circumstantial evidence. *Duchac v. State*, 505 S.W.2d 237, 241 (Tenn. 1973). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" *State v. Rice,* 184 S.W.3d 646, 662 (Tenn. 2006) (quoting *Marable v. State*, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review [for sufficiency of the evidence] 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

In determining the sufficiency of the evidence, this Court should not re-weigh or reevaluate the evidence. *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990). Nor may this Court substitute its inferences for those drawn by the trier of fact from the evidence. *State v. Buggs*, 995 S.W.2d 102, 105 (Tenn. 1999) (citing *Liakas v. State*, 286 S.W.2d 856, 859 (Tenn. 1956)). "Questions concerning the credibility of witnesses, the weight and value to be given the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact." *State v. Bland,* 958 S.W.2d 651, 659 (Tenn. 1997). "A guilty verdict by the jury, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Grace*, 493 S.W.2d 474, 476 (Tenn. 1973). The Tennessee Supreme Court stated the rationale for this rule:

> This well-settled rule rests on a sound foundation. The trial judge and the jury see the witnesses face to face, hear their testimony and observe their demeanor on the stand. Thus the trial judge and jury are the primary instrumentality of justice to determine the weight and credibility to be given to the testimony of witnesses. In the trial forum alone is there human

> atmosphere and the totality of the evidence cannot be reproduced with a written record in this Court.

*Bolin v. State*, 405 S.W.2d 768, 771 (Tenn. 1966) (citing *Carroll v. State*, 370 S.W.2d 523, 527 (Tenn. 1963)). This Court must afford the State of Tennessee the "'strongest legitimate view of the evidence'" contained in the record, as well as "'all reasonable and legitimate inferences'" that may be drawn from the evidence. *Goodwin*, 143 S.W.3d at 775 (quoting *State v. Smith*, 24 S.W.3d 274, 279 (Tenn. 2000)). Because a verdict of guilt against a defendant removes the presumption of innocence and raises a presumption of guilt, the convicted criminal defendant bears the burden of showing that the evidence was legally insufficient to sustain a guilty verdict. *State v. Carruthers*, 35 S.W.3d 516, 557-58 (Tenn. 2000) (citations omitted).

**A. Attempted Second Degree Murder**

The Defendant asserts that the evidence is insufficient to support his conviction for attempted second degree murder because of Mr. Tellis's testimony that, after shooting Mr. Smith, the Defendant stated, "I could have killed you but I didn't." The State responds that the evidence showed that the Defendant was aware that firing a gun multiple times at Mr. Smith was reasonably certain to kill him. We agree with the State.

Second degree murder is defined as "the knowing killing of another." T.C.A. § 39-13-210(a)(1). "A person acts knowingly with respect to a result of the person's conduct when the person is aware that the conduct is reasonably certain to cause the result." T.C.A. § 39-11-302(b). A person attempts to commit second degree murder when he or she acts with intent to knowingly "cause a result that is an element of the offense, and believes the conduct will cause the result without further conduct on the person's part" or acts knowingly "to complete a course of action or cause a result that would constitute the offense, under the circumstances surrounding the conduct as the person believes them to be, and the conduct constitutes a substantial step toward the commission of the offense." T.C.A. § 39-12-101(a)(2)-(3).

The evidence, viewed in the light most favorable to the State, showed that the Defendant instigated a fight with Mr. Smith at his residence. The Defendant hostily approached Mr. Smith and ordered him out of the car. In the Defendant's back yard, Mr. Smith beat up the Defendant, resulting in the dislocation of the Defendant's shoulder. Humiliated by the loss, the Defendant obtained a gun from his car and began firing it as the group returned to Mr. Tellis's car to leave. The group scattered, leaving Mr. Smith alone by the car. Mr. Smith, who was unarmed, began to run from the gun fire. Two bullets came close to hitting him with the third striking him in the spine, leaving him permanently paralyzed. This evidence is sufficient to show that the Defendant fired his

gun at Mr. Smith repeatedly until Mr. Smith was hit, a substantial step toward the knowing killing of Mr. Smith and then ordered Ms. Flagg to remove Mr. Smith "off [his] street." From this evidence, a rational jury could conclude that the Defendant intentionally engaged in conduct that could have resulted in the knowing killing of Mr. Smith.

As to Mr. Tellis's testimony about the Defendant's post-shooting statement, "I could have killed you but I didn't," we note that it is the jury's prerogative to evaluate and weigh the evidence. Any alleged inconsistent statements and credibility issues were brought out on direct examination and underwent cross-examination. The weight and credibility of the testimony of a witness and the reconciliation of conflicts in testimony are matters entrusted exclusively to the jury. By its verdict, the jury exercised its prerogative and chose to accredit the testimony of the other State witnesses and Mr. Tellis's initial statement to the police. It is the jury who is charged with making credibility determinations, not this court. *Smith*, 24 S.W.3d at 278. The proof was sufficient for a jury to conclude beyond a reasonable doubt that the Defendant, by repeatedly firing a gun at Mr. Smith, knew that his actions were reasonably certain to cause the victim's death. Accordingly, we conclude that the evidence is sufficient to support the Defendant's conviction for attempted second degree murder. The Defendant is not entitled to relief.

### B. Employing a Firearm During the Commission of a Dangerous Felony

The Defendant's conviction for employing a firearm during the commission of, or attempt to commit a dangerous felony relied upon the attempted second degree murder of Mr. Smith for the dangerous felony element. As such, the Defendant argues that if this court finds the evidence insufficient for his attempted second degree murder conviction, absent the requisite dangerous felony, the evidence will also be insufficient as to the employing a firearm during the commission of dangerous felony conviction. Based upon our conclusion that there was sufficient evidence to support the attempted second degree murder conviction, we also conclude that there was sufficient evidence to support the employing a firearm during the commission of a dangerous felony conviction. The Defendant is not entitled to relief.

### C. Reckless Endangerment

The Defendant asserts that the evidence is insufficient to support his conviction for reckless endangerment because there was no proof that any of the named victims "were standing within the [D]efendant's line of fire." The State responds that the Defendant's act of firing his gun multiple times at Mr. Smith in the front yard of his house created an

imminent risk of death or serious bodily injury to Mr. Tellis, Mr. Campbell, Mr. Dancy, Mr. Brown, and Mr. Mull. We agree with the State.

A person commits reckless endangerment "who recklessly engages in conduct which places or may place another person in imminent danger of death or serious bodily injury." T.C.A. § 39-13-103(a). Reckless endangerment committed with a deadly weapon is a Class E felony. T.C.A. § 39-13-103(b). "Reckless" refers to a person "who acts recklessly with respect to circumstances surrounding the conduct or the result of the conduct when the person is aware of but consciously disregards a substantial and unjustifiable risk that the circumstances exist or the result will occur." T.C.A. § 39-11-106(a)(31). For the threat of death or serious bodily injury to be "imminent," the person must be placed in a reasonable probability of danger as opposed to a mere possibility of danger. *See State v. Fox*, 947 S.W.2d 865, 866 (Tenn. Crim. App. 1996). The "zone of danger" is defined as the area in which a reasonable probability exists that the defendant's conduct would place others in imminent danger of death or serious bodily injury if others were present in that zone or area. *State v. Payne*, 7 S.W.3d 25, 28 (Tenn. 1999).

The Defendant cites *State v. Fox*, in support of his contention that the State failed to prove the named victims in the indictment were within the zone of danger. *Fox*, 947 S.W.2d 865. In *State v. Fox*, the Court of Criminal Appeals considered a defendant's discharge of a weapon into a tree and noted the importance of distinguishing the area in which a reasonable probability of harm exists from an area in which a mere possibility of harm exists. "This Court has previously recognized the potentially 'absurd' and 'unreasonable' results that may arise from permitting prosecution of one discharging 'a weapon under any circumstances where any other human being might possibly be present or where a stray bullet might possibly strike another person.'" *Id*. at 866. The court found that simply discharging a gun into the air absent a showing that someone was threatened did not constitute reckless endangerment. *Id*. "The discharge must create an imminent risk of death or serious bodily injury to some person or class of persons." *Id*.

In the present case, the named victims were walking out to Mr. Tellis's vehicle to leave with Mr. Smith. When the Defendant began firing his gun at Mr. Smith, the others fled from the gunfire in differing direction but all were in the front yard with Mr. Smith at the time the Defendant opened fire. This is not a case where the Defendant was discharging his weapon into the air as in *Fox*. The Defendant was aiming and shooting at Mr. Smith who, along with the named victims, was walking through the front yard to Mr. Tellis's car. Ms. Flagg and Mr. Tellis testified that they were fearful as the Defendant fired the gun toward Mr. Smith and that they ran from the gunfire. This evidence supports the jury's findings that Mr. Tellis, Mr. Campbell, Mr. Dancy, Mr. Brown, and Mr. Mull were present in the area where the Defendant opened gunfire on Mr. Smith and

that the Defendant's conduct of repeatedly firing his gun at Mr. Smith in the front yard created an imminent risk of death or serious bodily injury for these men. The Defendant is not entitled to relief.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's judgments.

_____
ROBERT W. WEDEMEYER, JUDGE